Robert E. Grossman (RG-3602)
Schuyler G. Carroll (SC-0100)
Christopher J. Giaimo, Jr. (CG-2260)
ARENT FOX PLLC
1675 Broadway
New York, New York 10019
(212) 484-3900

Attorneys for the Debtor

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

In re                                                                      Chapter 11

LAKE DIAMOND ASSOCIATES, LLC,                        Case No. 04-11182

                        Debtor.

---------------------------------------------------------x

LAKE DIAMOND ASSOCIATES, LLC,

                             Plaintiff,                  Adv. Pro. No. _____

  vs.

COMMUNITY NATIONAL BANK,

                            Defendant

---------------------------------------------------------x

## VERIFIED COMPLAINT

     Lake Diamond Associates, LLC (the "Debtor"), by and through its counsel, Arent Fox

PLLC, hereby files this Verified Complaint against Community National Bank, the defendant

herein (the "Bank"), and in support thereof, states as follows:

### NATURE OF THIS ACTION

     1.     The Debtor is the owner and developer of a tract of land in Ocala, Florida.

The property is fully approved for 950 residential home sites and is improved with an 18-hole

championship golf course and a 43-acre man-made lake. Approximately 190 lots have been sold.

2. The property was acquired in April 2002 with a combination of $3 million of equity and $6 million of debt provided by the Bank. Approximately $2 million of the financing provided by the Bank was used to construct model homes and develop a marketing staff and marketing materials. The Debtor granted the Bank a mortgage on a portion of the Real Property (hereinafter defined) as security for its financing.

3. The Debtor realized that construction of a clubhouse for the golf course and other recreational facilities was critical to attracting home buyers and achieving the sales goals for the project. Towards this end, the Bank issued a commitment letter in January 2003 to provide the additional funding needed to construct the clubhouse. However, the commitment required the Debtor to use $1 million of the loan proceeds to benefit an unrelated project where the Bank was the lender and the borrower was an affiliate of the Debtor's managing member. Ultimately, the Debtor informed the Bank that it could not collateralize the Real Property for the benefit of an affiliate. Thereafter, the Debtor and the Bank continued to negotiate the terms of the commitment.

4. During the time the Debtor was negotiating the commitment, the Bank requested that the lien granted pursuant to its mortgage be spread to include _all_ of the Real Property. The Debtor initially refused. However, driven by the need for additional funding to "prime the pump" at the project, the Debtor agreed to collateralize that portion of the Real Property previously excluded in consideration for $2 million of financing to construct the clubhouse and a $1 million line of credit to meet other operating costs. The new loan was closed on June 20, 2003.

5.    At the closing, the Bank drew down on the line of credit to pay real estate taxes and interest, and the Debtor advanced additional sums to pay the Bank's commitment fee. Thereafter, despite repeated requests, the Bank denied any additional draw requests. As a result, the Debtor could not construct the clubhouse and recreational facilities necessary to attract home buyers to the project.

6.    The action of the Bank in breaching its obligations to the Debtor resulted in the Debtor seeking the protection of this Court on February 24, 2004 (the "Petition Date"). By this adversary proceeding, the Debtor seeks redress for the Bank's inequitable and improper conduct.

7.    The Complaint sets forth five (5) claims seeking redress on behalf of the Debtor and its estate: for declaratory judgment (Count I), to set aside a fraudulent transfer (Counts II, III, and IV), and breach of contract (Count V).

## THE PARTIES

8.    Plaintiff Debtor is a limited liability company organized under the laws of the State of New York, maintains its principal place of business in New York, and is authorized to conduct business in the State of Florida.

9.    Upon information and belief, Defendant Bank is, and at all relevant times was, a Virginia corporation having its principal place of business at 1300 Kings Mountain Road, Martinsville, Virginia 24112.

## JURISDICTION AND VENUE

10.    The Debtor brings this adversary proceeding pursuant to and under Rule 7001 of the Federal Rules of Bankruptcy Procedure, seeking relief pursuant to, *inter alia,* sections 544(b), 548(a), 550, and 551 of title 11 of chapter 11 of the United States Code (the "Bankruptcy

Code") and Florida Statutes sections 726.105 and 726.106, seeking to avoid certain transfers of the Debtor's property and to recovery money damages.

11.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because this is a civil proceeding arising under the Bankruptcy Code or arising in or related to the Debtor's case.

12.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## FACTUAL BACKGROUND

14.     The Debtor was formed to acquire, own, develop and otherwise manage certain real property located in Marion County, Florida (the "Real Property"). The Real Property consists of approximately 762 out of 950 residential home sites (the balance having been sold) to be built around an existing 18-hole championship golf course and 43-acre man-made lake (the "Project").

15.     In April 2002, after executing a contract to acquire the Real Property, the Debtor approached a number of financial institutions regarding financing for the acquisition and development of the Project. The Debtor anticipated that it would need approximately $20 million on a revolving basis to finance the Project, including construction of a clubhouse and the building of residential homes.

16.     An affiliate of the Debtor had a pre-existing relationship with the Bank, therefore, the Debtor asked the Bank to review and consider its financial request regarding the Project. After reviewing the request, the Bank agreed to loan the Debtor $6 million for the acquisition and development-related costs, including the construction of model homes and certain marketing and soft costs (the "Original Loan"). The parties agreed that the Bank would

consider additional financing for further development of the Project, specifically recognizing the Project's need for construction of a clubhouse and other amenities.

17. On May 20, 2002, the Debtor closed on the purchase of the Project from Atlantis Venture Investments, Ltd., and its affiliate Sonnig Homes, Ltd., for an amount (together with closing and related costs) of approximately $6 million. The Bank funded $4 million of the Debtor's purchase through a promissory note dated May 20, 2002, in the original principal amount of $6 million (the "Original Note"). See Original Note attached as Exhibit A. The balance of the purchase price was funded with $3 million of equity.

18. To secure the obligations under the Original Note, the Debtor and the Bank entered into a Mortgage and Security Agreement dated May 20, 2002 (the "Original Mortgage"). See Original Mortgage attached as Exhibit B. The Original Mortgage granted the Bank a security interest in that portion of the Real Property described on exhibit A to the Mortgage. See exhibit A to Original Mortgage. The Original Mortgage also excluded certain real property from the Bank's security interest (the "Excepted Property"). See exhibit A to Original Mortgage.

19. The Excepted Property consists of an approximately 32.9-acre portion of the approximately 320 acres of the Real Property and is located in the southeast corner of the Project. Development of the Excepted Property was the planned fourth phase of the overall five-phase development of the south side of the Project and contains approximately 42 proposed private residential lots sold and to be sold as part of the Project's overall community development.

20. Shortly after the Debtor acquired the Project, it drew down on the funds made available under the Original Note to construct model homes, cover marketing, sales, and soft costs, and to develop a sales center.

21.     Sales of residential units at the Project were hampered by the lack of a clubhouse and recreational facilities, such as a pool and tennis courts.  In the Debtor's opinion, these facilities are essential to attracting home buyers.

22.     As a result of slow sales, the Debtor had difficulty paying operating expenses, maintaining the debt service on the Original Note, and was otherwise operating at a deficit.  This resulted in certain liens being asserted against the Real Property.  Accordingly, as of March, 2003, the Debtor was unable to pay its bills as they became due.

23.     The Debtor and the Bank had anticipated the need for additional financing.  The original construction budget presented to the Bank of $20 million included a clubhouse and other recreational facilities.  Thus, in late 2003, the Debtor approached the Bank to discuss increasing the amount of the Original Loan as well as extending the maturity date of the Original Note.

24.     Pursuant to a commitment letter dated January 22, 2003, the Bank agreed to extend the Debtor an additional $3 million to commence construction of the clubhouse, as well as extend the maturity date of the Original Note.  However, the commitment required the Debtor to use $1 million of loan proceeds to benefit an unrelated project where the Bank was the lender and the borrower was an affiliate of the Debtor's managing member.  Ultimately, the Debtor informed the Bank that it could not collateralize the Real Property for the benefit of an affiliate.  Accordingly, the Debtor and the Bank continued to negotiate the terms of the commitment.

25.     At the same time the parties were negotiating the terms of the new loan, the Bank expressed concern that the lien provided by the Original Mortgage did not cover all of the Real Property.  The Bank asked the Debtor to enter into an agreement to "spread" the existing lien over the Excepted Property.  Initially, the Debtor refused.  However, driven by the need to

construct a clubhouse and obtain funds to "prime the pump" at the Project, as well as its need to extend the maturity date on the Original Loan, the Debtor agreed to collateralize the Excepted Property in consideration for the necessary financing.

26.    Finally, on June 20, 2003, the Debtor and the Bank memorialized their agreement to extend the maturity date of the Original Note and provide an additional $3 million of financing, $2 million of which was to provide construction financing for the clubhouse (the "Additional Loan"). The extension of the maturity date for the Original Note was evidenced by two renewal notes dated June 20, 2003 in the amount of $4 million and $2 million each (the "Renewal Notes"). See Renewal Notes attached as Exhibit C. The increase in principal of the Original Note was evidenced by two promissory notes in the amount of $1 million and $2 million each (the "Additional Notes"). See Additional Notes attached as Exhibit D. The Original Loan and the Additional Loan are collectively referred to as the "Pre-Petition Credit Agreement."

27.    As previously agreed by the parties, the Debtor granted a security interest in the Excepted Property as collateral for the Additional Loan. This security interest was granted pursuant to the following loan documents (i) a Mortgage Modification and Spreader Agreement (the "Spreader Agreement"), (ii) a Mortgage Modification and Extension Agreement and Receipt of Future Advance Agreement (the "Future Advance Agreement"), and (iii) a Collateral Assignment of Leases, Rents and Profits (the "Collateral Assignment"), all dated as of June 20, 2003. See Spreader Agreement, Future Advance Agreement, and Collateral Assignment attached as Exhibits E, F and G, respectively. The Original Note, Original Mortgage, Spreader Agreement, Future Advance Agreement, and the Collateral Assignment are collectively referred to as the "Pre-Petition Loan Documents."

28.     At the closing of the Additional Loan, the Bank drew down $238,868.41 on the new $1 million line of credit to clear real estate taxes which primed the Bank and to pay itself interest. The Debtor, on the other hand, paid $72,394.35 from its own funds to pay the Bank's commitment fee, remove certain liens and pay closing costs.

29.     After paying itself the foregoing amount, the Bank refused to permit the Debtor to make any draws on the Additional Loan. Indeed, the Debtor made numerous requests to draw against the $1 million line of credit to pay operating costs of the golf course, interest expense, and sums required to market and advertise the Project. The Bank consistently refused to permit any such draws.

30.     During this period, the Debtor faced stagnant sales, continued to operate at a deficit, and faced mounting debts and increased claims against the Debtor and the Real Property.

31.     On or about October 3, 2003, the Debtor sold one of its models and thereby repaid the Bank $233,474.89, representing 100 percent of the net sales proceeds.

32.     During the time the Debtor was negotiating for the Additional Loan, it determined to put the Project on the market for possible sale. At all relevant times, the Bank was made aware of the Debtor's efforts to sell the Project, which efforts continued after closing of the Additional Loan.

33.     During July, 2003, the Debtor received an acceptable offer to purchase the Project from Lowell Homes, Inc. ("Lowell"). The offer was in substantial excess of the amount owing to the Bank under the Pre-Petition Credit Agreement. Accordingly, the Debtor and Lowell entered into a purchase and sale agreement dated October 6, 2003. Pursuant to the terms of the purchase and sale agreement, Lowell had until December 15, 2003, to conduct its due diligence. Lowell advised the Debtor that it would be unable to meet the diligence deadline

without an extension.  The Debtor denied the deadline extension and on December 12, 2003,

Lowell terminated the purchase and sale agreement.

34.     Since the Debtor believed a sale of the Project to Lowell was imminent, it did

not commence construction of the clubhouse beyond a ground-breaking ceremony.

35.     After Lowell terminated the sale contract, in early January, 2004, the Debtor

approached the Bank seeking to draw down on the Additional Loan to begin construction of the

clubhouse.

36.     Notwithstanding the provisions of the Pre-Petition Loan Documents

(including the granting of the lien on the Excepted Property), the Bank, without cause, refused to

allow any draws on the $2 million line of credit, and threatened to call all amounts owing under

the Pre-Petition Credit Agreement.

37.     By letter dated January 16, 2004, the Bank declared the Pre-Petition Credit

Agreement in default.

38.     The Bank's refusal to allow the Debtor to draw down on the lines of credit

prevented the Debtor from being able to construct the clubhouse and other recreational facilities

at the Project.  Without the clubhouse and recreational facilities, the Debtor was unable to attract

home buyers to the Project.  Accordingly, the Bank's unwarranted refusal to allow any draws on

its lines of credit (other than those that benefited the Bank) thwarted homes sales at the Project

and left the Debtor without sufficient capital to support its business.

## COUNT I

### Declaration That Bank May Not
### Enforce Rights Under Pre-Petition Loan Documents

39.     The Debtor repeats, realleges and incorporates each and every allegation

contained in paragraphs 1-38 of this Complaint with the same force and effect as though fully set

forth herein.

40.     As alleged in detail above, the Bank has engaged in improper and inequitable

conduct and, as such, has acted in bad faith.

41.     The Bank has breached its duty of good faith and fair dealing.

42.     The Bank is not entitled to enforce the powers provided to them under the Pre-

Petition Loan Documents, by virtue of the previously detailed bad-faith conduct by the Bank.

43.     By virtue of the foregoing, the Pre-Petition Loan Documents were breached.

44.     Accordingly, the Debtor is entitled to a declaration that neither the Bank, nor

its transferees, successors and assigns, are entitled to enforce the rights under the Pre-Petition

Loan Documents.

## COUNT II

### Claim to Set Aside Fraudulent Transfer
### (11 U.S.C. § 548(a)(1)(B))

45.     The Debtor repeats realleges and incorporates each and every allegation

contained in paragraphs 1-44 of this Complaint with the same force and effect as though fully set

forth herein.

46.     Under section 548(a)(1)(B) of the Bankruptcy Code, a transfer is avoidable if

(i) such transfer was made or incurred on or within one (1) year before the date of filing of the

petition, (ii) the debtor did not receive reasonably equivalent value for the property transferred, and (iii) one of the following three tests is satisfied:

    a.  the debtor was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

    b.  the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

    c.  the debtor intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548.

47.    With respect to the transfer made by the Debtor to the Bank, (i) such transfer was made within one (1) year of the Petition Date; and (ii) the Debtor received less than equivalent value in exchange.

48.    Specifically, the Debtor transferred a security interest in the Excepted Property to the Bank on or after June 20, 2003, and did not receive reasonably equivalent value or fair consideration in return therefor given that the Bank refused to allow the Debtor to draw down on its additional lines of credit.

49.    Further, at all times from and after June 20, 2003, the Debtor (i) was engaged in a business or a transaction, or about to engage in a business or a transaction, for which any property remaining with the Debtor was an unreasonably small amount of capital; and (ii) intended to incur, or believed it would incur, debts beyond the Debtor's ability to pay as such debts matured.

50.    Accordingly, the transfer made to the Debtor by the Bank in the year prior to the Petition Date should be avoided as a fraudulent conveyance, and such transfer, or the value thereof, should be recovered and preserved in its entirety for the benefit of the Debtor's estate and unsecured creditors.

## COUNT III

**Claim to Set Aside Fraudulent Transfer**
**Pursuant to Florida Uniform Transfer Act**
**(11 U.S.C. § 544(b), Florida Statute § 726.105(1)(b))**

51.    The Debtor repeats, realleges and incorporates each and every allegation contained in paragraphs 1-50 of this Complaint with the same force and effect as though fully set forth herein.

52.    Under Florida Statute § 726.105(1)(b) a transfer is avoidable as a fraudulent transfer as to present and future creditors if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer, and the debtor:

a.    was engaged or about to be engaged in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

b.    intended to incur, or believed or reasonably believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. St. § 726.105(1)(b).

53.    The statute of limitations for a cause of action under Florida Statute § 726.105(1) is four (4) years.

54.    With respect to the transfer made by the Debtor to the Bank, (i) such transfer was made within four (4) years of the Petition Date; (ii) the Debtor received less than equivalent value in exchange; (iii) the Debtor was engaged or about to be engaged in a business or a

transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; and (iv) the Debtor intended to incur and did incur debts beyond the Debtor's ability to pay as they became due.

55.    Specifically, the Debtor transferred a security interest in the Excepted Property to the Bank on or after June 20, 2003, and did not receive reasonably equivalent value or fair consideration in return therefor given that the Bank refused to allow the Debtor to draw down on its additional lines of credit.

56.    At all times from and after June 20, 2003, the Debtor was engaged in a business or a transaction, or about to engage in a business or a transaction, for which the property remaining with the Debtor was an unreasonably small amount of capital, and the Debtor intended to incur, or believed it would incur, debts beyond the Debtor's ability to pay as such debts matured.

57.    Accordingly, the transfer made by the Debtor to the Bank in the four (4) years prior to the Petition Date should be avoided as a fraudulent conveyance, and such transfer, or the value thereof, should be recovered and preserved in its entirety for the benefit of the Debtor's estate and unsecured creditors.

<u>COUNT IV</u>

**Claim to Set Aside Fraudulent Transfer
Pursuant to Florida Uniform Transfer Act
(11 U.S.C. § 544(b), Florida Statute § 726.106(1))**

58.    The Debtor repeats, realleges and incorporates each and every allegation contained in paragraphs 1-57 of this Complaint with the same force and effect as though fully set forth herein.

59.    Under Florida Statute § 726.106(1), a transfer is avoidable as a fraudulent transfer as to present creditors if the debtor made the transfer without receiving a reasonably

equivalent value in exchange for the transfer and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer. Fla. St. § 726.106(1).

60.    Pursuant to Florida Statute § 726.103(2), a debtor who is generally not paying debts as they become due is presumed to be insolvent. Fla. St. § 726.103(2).

61.    The statute of limitations for a cause of action under Florida Statute § 726.106(1) is four (4) years.

62.    With respect to the transfer made by the Debtor to the Bank, (i) such transfer was made within four (4) years of the Petition Date; (ii) the Debtor received less than equivalent value in exchange; and (iii) the Debtor was insolvent at the time or the transfer or became insolvent as a result of such transfer.

63.    Specifically, the Debtor transferred a security interest in the Excepted Property to the Bank on or after June 20, 2003, and did not receive reasonably equivalent value or fair consideration in return therefor given that the Bank refused to allow the Debtor to draw down on its additional lines of credit.

64.    At all times from and after June 20, 2003, the Debtor was unable to pay its debts as they became due and was therefore insolvent.

65.    Accordingly, the transfer made by the Debtor to the Bank in the four (4) years prior to the Petition Date should be avoided as a fraudulent conveyance, and such transfer, or the value thereof, should be recovered and preserved in its entirety for the benefit of the Debtor's estate and unsecured creditors.

## COUNT V

## Breach of Contract

66. The Debtor repeats, realleges and incorporates each and every allegation contained in paragraphs 1-65 of this Complaint with the same force and effect as though fully set forth herein.

67. The Debtor executed the Additional Notes setting forth certain rights and obligations of the parties.

68. The Bank received a non-refundable commitment fee of $20,000 for the advance of funds described in the Additional Notes.

69. As set forth in paragraphs 1 to 50 of the Complaint, the Bank breached the Additional Notes and its implied covenants of good faith and fair dealing by failing to extend available funds to the Debtor under the additional lines of credit, improperly exercising dominion and control over the Project by preventing the Debtor from funding, controlling and completing the Project, declaring the Debtor in default under the Pre-Petition Loan Documents, accelerating the obligations of the Pre-Petition Credit Agreement and threatening legal action for allegedly breaching the terms of the Pre-Petition Loan Documents.

70. As a result of the Bank's breaches of contract and implied covenants of good faith and fair dealing, the Debtor seeks a declaration that the Bank is liable for damages including but not limited to the expenses and lost profits associated with the Project.

## PRAYERS FOR RELIEF

1. On Count I, declaring that the Bank is not entitled to enforce its rights under the Pre-Petition Credit Agreement and the Pre-Petition Loan Documents;

2. On Count II, avoiding, as a fraudulent conveyance pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the lien on the Excepted Property granted in favor

of the Bank made by the Debtor in the year prior to the Petition Date, and recovering and preserving the Excepted Property in its entirety, or the value thereof, for the benefit of the Debtor's estate and unsecured creditors;

3.      On Count III, avoiding, as a fraudulent conveyance pursuant to Florida Statute § 726.105(1), the lien on the Excepted Property granted in favor of the Bank made by the Debtor in the year prior to the Petition Date, and recovering and preserving the Excepted Property in its entirety, or the value thereof, for the benefit of the Debtor's estate and unsecured creditors;

4.      On Count IV, avoiding, as a fraudulent conveyance pursuant to Florida Statute § 726.106(1), the lien on the Excepted Property granted in favor of the Bank made by the Debtor in the year prior to the Petition Date, and recovering and preserving the Excepted Property in its entirety, or the value thereof, for the benefit of the Debtor's estate and unsecured creditors;

5.      On Count V, granting judgment against the Bank for damages sustained in an amount to be determined at trial, plus pre-judgment interest;

6.      Awarding such other and further relief as the Court deems just and proper.


Dated: New York, New York
        March 8, 2004

                                        ARENT FOX PLLC
                                        Proposed Attorneys for the Debtor

                                        By:   _/s/ Christopher J. Giaimo_____
                                              Robert E. Grossman (RG-3602)
                                              Schuyler G. Carroll (SC-0100)
                                              Christopher J. Giaimo, Jr. (CG-2260)
                                              1675 Broadway
                                              New York, NY 10019
                                              (212) 484-3900

# VERIFICATION

STATE OF NEW YORK     )
                          )   SS:

COUNTY OF NEW YORK   )

JACOB A. FRYDMAN, being duly sworn, deposes and says:

I am the President of Savoy Retirement Communities, Inc., the managing member of Lake Diamond Associates, LLC, a New York limited liability company authorized to do business in Florida (the "Debtor").

I have read the foregoing Verified Complaint; and the allegations contained therein are true to my knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true, based upon the books and records of the Debtor.

_____
Jacob A. Frydman

Sworn to and subscribed before me
this ___ day of March, 2004.

_____
Notary Public

**BRUCE LAZARUS**
**NOTARY PUBLIC-STATE OF NEW YORK**
**No. 4990593**
**Qualified in Westchester County**
**My Commission Expires January 13, 2006**

17

LDR/106428.4